# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| Service Employees International Union, Raquel Molina, Ana Lemus, Saint Paul Paul, and Daysi Rocha-Cruz, | ) ) ) ) | |
| *Plaintiffs*, | ) ) | **No.** |
| v. | ) ) | |
| Rodney S. Scott, Commissioner of U.S. Customs and Border Protection; U.S. Customs and Border Protection; Kristi L. Noem, Secretary of Homeland Security; U.S. Department of Homeland Security; Julio Caravia, U.S. Customs and Border Protection Area Port Director (Boston Logan International Airport); Jason Adams, U.S. Customs and Border Protection Area Port Director (San Francisco International Airport); Roderick W. Hudson, U.S. Customs and Border Protection Area Port Director (Houston/Galveston Area); Melissa Armijo, Acting U.S. Customs and Border Protection Area Port Director (Orlando International Airport); and Salvatore Ingrassia, U.S. Customs and Border Protection Area Port Director (John F. Kennedy International Airport), | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **COMPLAINT** |
| *Defendants*. | ) ) ) | |

1

## INTRODUCTION

For forty years, immigrant workers with lawful status, work authorization, and Customs security access have performed crucial services at airports nationwide. They have cleaned airplane cabins, attended to passenger luggage, and assisted passengers with special needs such as wheelchair users, people with disabilities, and unaccompanied minors. Billions of passengers have relied on these workers. Now, to advance the President's zealous anti-immigrant agenda under the pretext of airport security, Defendants have abruptly altered their interpretation of long-standing employment eligibility standards in order to strip these essential workers of their jobs, without explanation or process. Defendants' actions violate the Administrative Procedure Act ("APA") and the Due Process Clause of the Fifth Amendment to the United States Constitution.

To access airport areas related to international travel, Defendants require airport workers to display a Customs seal, approved and issued by United States Customs and Border Protection ("CBP"). The seal application process, initiated by airport employers and governed by federal regulations, has historically been straightforward. Workers supply proof of work authorization to their potential employers, companies that contract with airport authorities and airlines to perform services such as airplane cabin cleaning and passenger accompaniment. These employers conduct background checks on applicants and explain to CBP why a Customs seal is required for the applicants' employment. Once CBP grants a seal, the agency will generally renew it absent a material change in the seal holder's circumstances. Employers, airport authorities, airlines, and workers have relied on this system for decades. Through it, CBP has balanced the need to provide stable and essential services in international airports with airport security concerns.

Since February 2025, however, Defendants have abruptly and haphazardly upended this established system. They have revoked the Customs seals of lawful immigrant airport workers en masse pursuant to a new and unjustified interpretation of CBP regulations. Defendants have targeted workers coast to coast, revoking the Customs seals of workers at sites including Boston Logan International Airport ("Logan Airport"), San Francisco International Airport ("SFO"), John F. Kennedy International Airport ("JFK"), George Bush Intercontinental Airport ("Houston Airport"), and Orlando International Airport ("Orlando Airport"). In their haste to make life in the United States intolerable for even lawful immigrant workers by depriving them of their livelihoods, Defendants have acted arbitrarily and capriciously, failed to comply with CBP's own rules, and violated workers' due process rights.

Raquel Molina, Ana Lemus, Saint Paul Paul, and Daysi Rocha-Cruz ("Individual Plaintiffs") are employment-authorized noncitizens and members of Plaintiff Service Employees International Union ("SEIU") who were employed for many years at Logan Airport with Customs seal security clearance. Individual Plaintiffs have labored in various capacities serving the public, servicing airlines, and furthering the safe operation of the airport. In 2025, Defendants summarily revoked Individual Plaintiffs' Customs seals based on Defendants' novel, arbitrary, and unlawful interpretation of the requirement that seal holders have "authorized residency," a term nowhere defined in the Immigration and Nationality Act. In addition, Defendants revoked Plaintiff Rocha-Cruz's seal on the basis of a novel and arbitrary interpretation of the term "violation of a U.S. immigration law."

As a direct result of these actions, Individual Plaintiffs and many lawful immigrant workers like them lost their jobs and livelihoods. Defendants did not afford any of them a pre-deprivation hearing. This suit challenges the seal revocations and the policies triggering those

3

revocations on multiple independent grounds, including that the agency's change in interpretation of "authorized residency" is unlawful, the denial of pre-deprivation hearings violated due process, and the agency's interpretation and enforcement of "violation of a U.S. immigration law" in the Customs seal regulations is unlawful.

Plaintiff SEIU represents approximately 40,000 airport workers nationwide, including Individual Plaintiffs. Thousands of SEIU members have lost or are at imminent risk of losing their Customs seals pursuant to Defendants' new Customs seal policies. SEIU, on behalf of its members, and Individual Plaintiffs therefore bring this action under the APA and the United States Constitution.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331 because the action arises under the Constitution and laws of the United States.

2.      Defendants have waived their sovereign immunity for suits seeking injunctive relief against constitutional and statutory violations. 5 U.S.C. § 702.

3.      Venue is proper under 28 U.S.C. § 1391(b)(2) and (e)(1).

## PARTIES

4.      Plaintiff SEIU is a union of over two million diverse health care, public sector, and property service workers in North America, including the Individual Plaintiffs in this action. SEIU members are united by the belief in the dignity and worth of all workers and the services they provide. The union is dedicated to improving the lives of workers and their families and creating a more just and humane society. The union's headquarters are in Washington, D.C.

5.      Plaintiff Raquel Molina is a 65-year-old Boston resident, SEIU member, and former employee at Logan Airport, who worked at the airport for twenty-seven years prior to CBP's revocation of her Customs seal in 2025.

6.      Plaintiff Ana Lemus is a 58-year-old Boston-area resident, SEIU member, and former employee at Logan Airport, who worked at the airport for more than six years prior to CBP's revocation of her Customs seal in 2025.

7.      Plaintiff Saint Paul Paul is a 58-year-old Boston resident, SEIU member, and former employee at Logan Airport, who worked at the airport for approximately three years prior to CBP's revocation of his Customs seal in 2025.

8.      Plaintiff Daysi Rocha-Cruz is a 27-year-old Boston resident, SEIU member, and employee at Logan Airport, who previously worked at Logan Airport for approximately six to eight months prior to CBP's revocation of her Customs seal in 2025. She now works for a different employer at the airport. Her current airport job does not require a Customs seal.

9.      Defendant Rodney S. Scott is the Commissioner of United States Customs and Border Protection. As the head of CBP, Mr. Scott manages all agency operations and oversees agency policy governing U.S. international airports and airport workers. He is sued in his official capacity.

10.     Defendant United States Customs and Border Protection is a component of the United States Department of Homeland Security ("DHS") and an "agency" within the meaning of 5 U.S.C. § 551(1). CBP administers the provision and revocation of Customs access seals allowing individuals, such as airport workers, to enter Customs security areas.

11.     Defendant Kristi L. Noem is the Secretary of Department of Homeland Security. As agency head, Secretary Noem directs DHS component agencies and oversees agency policy

governing U.S. international airports and airport workers, including interpretation and enforcement of Customs seal regulations. She is sued in her official capacity.

12.    Defendant United States Department of Homeland Security is a cabinet-level department of the Executive Branch of the federal government and is an "agency" within the meaning of 5 U.S.C. § 551(1). DHS includes various component agencies, including CBP.

13.    Defendant Julio Caravia is CBP Area Port Director for Boston Logan International Airport in Boston, Massachusetts ("Logan Port Director"). As Port Director, Mr. Caravia is responsible for CBP operations at the airport. He is sued in his official capacity.

14.    Defendant Jason Adams is CBP Area Port Director for San Francisco International Airport in San Francisco, California. As Port Director, Mr. Adams is responsible for CBP operations at the airport. He is sued in his official capacity.

15.    Defendant Roderick Hudson is CBP Area Port Director for the George Bush Intercontinental Airport in Houston, Texas. As Port Director, Mr. Hudson is responsible for CBP operations at the airport. He is sued in his official capacity.

16.    Defendant Melissa Armijo is Acting CBP Area Port Director for Orlando International Airport in Orlando, Florida. As Port Director, Ms. Armijo is responsible for CBP operations at the airport. She is sued in her official capacity.

17.    Defendant Salvatore Ingrassia is CBP Area Port Director for John F. Kennedy International Airport in New York City, New York. As Port Director, Mr. Ingrassia is responsible for CBP operations at the airport. He is sued in his official capacity.

## LEGAL FRAMEWORK

### *Overview of CBP's Customs Seal Regulations*

18.    To access "Customs security areas" in international airports, airport workers must

possess a Customs seal. 19 C.F.R. § 122.182.

19.    "Customs security areas" are defined as "federal inspection services areas . . . designated for processing passengers, crew, their baggage and effects arriving from, or departing to, foreign countries, as well as the aircraft deplaning and ramp area and other restricted areas designated by the port director." *Id.* § 122.181.

20.    To apply for a Customs seal, an employer must submit an application form to the CBP Port Director (Customs Form 3078). *Id.* § 122.182(c)(1). Employers must attest in writing to the employee's need for the Customs seal. *Id.*

21.    Employers must also attest to having completed a background check on the employee. *Id.* § 122.182(d).

22.    Under the regulations, the Port Director "may" require employees to submit fingerprints, a photograph, or "[p]roof of citizenship or authorized residency" as part of their seal application. *Id.* § 122.182(c)(1)(i)-(ii).

23.    Unless surrendered, each seal remains valid for two years following the date of issuance. *Id.* §§ 122.182(a), 122.182(g).

24.    The employee may reapply for one or more additional two-year periods. *Id.* § 122.182(c)(2). Reapplications differ from initial applications in that they do not require a written attestation from the employer if there has been no change of employment. *Id.*

25.    Agency regulations enumerate grounds for CBP denial of seal applications. *Id.* § 122.183(a). These regulations include a provision that CBP will not issue a seal to "any person whose access to the Customs security area will, in the judgment of the port director, endanger the revenue or the security of the area or pose an unacceptable risk to public health, interest or safety, national security, or aviation safety." *Id.*

7

26.     Agency regulations further provide that CBP will not issue a seal to an applicant who has "committed any act or omission involving" "[a]ny violation of a U.S. immigration law." *Id.* § 122.183(a)(4)(xxxiv).

27.     Grounds for denial of a seal are grounds for revocation of an already-granted seal. *Id.* § 122.187(a)(2)(iv).

28.     Where an employee "has been arrested for, or charged with" a ground for denial, such as "[a]ny violation of a U.S. immigration law," the Port Director must immediately revoke their seal. *Id.* §§ 122.187(a)(2)(iii), 122.187(a)(1)(i).

29.     Under the regulations, the Port Director must give written notice of the seal revocation to the employee within ten calendar days of revocation. *Id.* § 122.187(b)(1). The notice must specify whether revocation is effective immediately or is a proposed action. *Id.* § 122.187(b). If the revocation is effective immediately, the notice must state the specific grounds for revocation, direct the employee to immediately surrender the seal, and notify the employee of their option to appeal. *Id.* § 122.187(b)(1).

30.     An employee may file a written appeal of the final notice of immediate revocation within thirty calendar days of the date of the notice. *Id.* § 122.187(b)(1)(ii).

31.     Should the employee choose to appeal without requesting a hearing, the Port Director must forward the administrative record to the Director of Field Operations at the Customs Management Center with jurisdiction over the Office of the Port Director. *Id.* § 122.187(c)(2)(ii). The Director of Field Operations must issue a written decision on the appeal. *Id.* § 122.187(c)(3).

### *Evolution of CBP's Customs Seal Regulations*

32.     On September 12, 1986, in response to "terrorist incidents at foreign airports" and

"threats of violence at U.S. airports," the U.S. Customs Service (the predecessor agency to CBP) promulgated regulations requiring employees with unescorted access to Customs security areas at international airports to possess and display on demand a Customs-approved seal. Customs Regulations Amendment Concerning Access to Customs Security Areas at Airports, 51 Fed. Reg. 32448, 32449 (Sep. 12, 1986) (revised and codified at 19 C.F.R. pt. 122).

33.     The regulations provided that the Customs Service could deny or revoke seals, *id.* at 32450-51, but prohibited the Customs Service from revoking a seal without an opportunity for the affected employee to first contest the action*, id.* at 32451.

34.     To revoke a seal, the "district director" (the predecessor to the Port Director) was required to give notice of the proposed action in writing to the employee. The employee would then have the option to request a hearing. Every timely request for a hearing would be granted. At the hearing, employees could be represented by counsel, submit evidence and testimony, and cross-examine witnesses. Following the hearing, the Commissioner of Customs or their designee would render their decision. *Id.*

35.     Accordingly, between 1986 and 2002, the district director could not revoke a Customs seal until the affected employee had an opportunity to be heard and the administrative process concluded.

36.     Following the attacks on September 11, 2001 and heightened public concern about airport security, the Customs Service initiated a review of its security standards and procedures. On July 29, 2002, the agency promulgated an interim final rule ("2002 IFR"), substantially amending the Customs seal regulations. Access to Customs Security Areas at Airports, 67 Fed. Reg. 48977 (Jul. 29, 2002) (codified at 19 C.F.R. pt. 122).

37.     The 2002 IFR instituted the modern sealing regime, which has not been substantially amended since.

38.     First, it provided a new process for immediate revocation of seals in emergency situations ("emergency revocation"). No longer would employees be guaranteed an opportunity to contest the agency's action prior to losing physical access to their workplace. *See* 19 C.F.R. § 122.187(b)(1) (authorizing immediate action "whenever in the judgment of the port director . . . an emergency situation involving public health, safety, or security is involved," with "final notice . . . issued to the affected employee within 10 calendar days").

39.     Second, the 2002 IFR drastically narrowed employees' opportunity to submit evidence and cross-examine witnesses to contest the revocation of their seals. According to the new emergency revocation procedures, a hearing would only be provided at the appeal stage, *after* the seal had been revoked, and only if the employee demonstrated a "genuine issue of fact that is material to the revocation or suspension action." *Id.* § 122.187(b)(1)(ii).

40.     Third, the 2002 IFR significantly increased the potential grounds for revocation of seals, adding that any person who "has been arrested for, or charged with" "[a]ny violation of a U.S. immigration law" would lose their seal. *Id.* §§ 122.187(a)(2)(iii), 122.183(a)(4)(xxxiv).

41.     Fourth, the 2002 IFR gave discretion to the Port Director to determine who poses an unacceptable risk to public health, interest or safety, national security, or aviation safety, *see id.* § 122.183(a), and thus may lose their seal pursuant to *id.* § 122.187(a)(2)(iv).

42.     These regulatory changes purported to give the Customs Service discretion to revoke Customs seals and, as a direct result, terminate the employment of any airport worker who requires a Customs seal to perform their job.

10

Since 2002, this power has never been wielded at its limits. However, since February 2025, CBP has been invoking the regulations to systematically target the lawful immigrant workers on whom international airport passengers, airlines, and operations rely.

## STATEMENT OF FACTS

43.     SEIU members and other airport workers who require Customs seals perform essential tasks such as cleaning and preparing planes for takeoff, cleaning terminals, attending to passenger luggage, driving between terminals, and helping people in wheelchairs get to where they need to go.

44.     Workers receive their Customs seals from their employers. Many seal holders work for companies that contract with airlines to provide essential services such as cabin cleaning or passenger accompaniment. These employers perform background checks on workers applying for jobs that require Customs seals and are generally responsible for submitting applications on behalf of workers to CBP for Customs seals.

45.     Customs seals are affixed to security badges. SEIU members and other workers typically scan or display security badges upon entering international terminals and baggage handling areas, as well as international flights in domestic terminals.

### *CBP's Mass Cancellation of Customs Seals*

46.     Since February 2025, CBP has revoked en masse the Customs seals of SEIU members and other immigrant airport workers, including green card applicants, Temporary Protected Status ("TPS") holders, and asylum seekers, all of whom possess valid work authorization.

47.     These actions constitute a nationwide assault on immigrant airport workers. Defendants have been revoking and declining to renew Customs seals at international airports

across the country, including Logan Airport, JFK, SFO, Orlando Airport, and Houston Airport. Many of the affected airport workers have lived with their children and families in the United States and been dues-paying members of local affiliates of SEIU for years.

48.    As a result of losing their seals, SEIU members and other airport workers have lost their jobs because the seals are a condition of their employment. At Logan Airport alone, CBP has forced at least 80 workers out of their jobs since April 2025.

49.    Some workers have experienced months of unemployment. Others have been forced to take in boarders or work longer hours for less pay in order to make ends meet.

50.    CBP has sent revocation letters on an ad hoc basis to employers or affected workers, using form language that does not elaborate on any rationale for the revocation.

51.    In letters sent to SEIU members including Individual Plaintiffs, CBP alleged that these workers lack "authorized residency" and therefore fail to meet "authorized residency" requirements of 19 C.F.R. § 122.182(c).

52.    The letters stated that possession of valid work authorization does not confer "authorized residency."

53.    The letters did not define "authorized residency."

54.    The letters further stated that, pursuant to 19 C.F.R. §§ 122.187(a)(2)(iv) and 122.183(a), in the judgment of the Port Director, lack of "authorized residency" is grounds for revocation because it poses an unacceptable risk to public health, interest or safety, national security, aviation safety, airport revenue, or Customs security.

55.    These allegations represented a sudden and unexplained departure from CBP's longstanding implementation of the Customs seal regulations.

56.     Prior to 2025, proof of valid work authorization was sufficient to satisfy the "authorized residency" application requirement.

57.     Since at least February 2025, CBP has changed its interpretation of "authorized residency" to refer only to certain U.S. immigration statuses and distinguished it from authorization to work.

58.     CBP has memorialized this changed interpretation of "authorized residency" in writing.

59.     CBP memos sent to airport services employers at JFK and SFO demonstrate that CBP abruptly narrowed its interpretation of "authorized residency." A CBP memo dated May 28, 2025, and delivered to employers at JFK ("JFK Memo," attached as Exhibit 1) instructs employers that seal applicants' employment authorization documentation must be "accompanied by a document showing proof of <u>authorized residency in the United States</u>" (emphasis in original).

60.     Similarly, a CBP memo delivered to SFO employers on or about November 19, 2025 ("SFO Memo," attached as Exhibit 2) notifies employers that "while a valid Employment Authorization Document (EAD) grants permission to work in the United States, it **does not** confer authorized residency status" (emphasis in original).

61.     According to the JFK Memo, persons with "authorized residency" now include only U.S. citizens; lawful permanent residents; persons admitted as refugees; persons granted asylum; Deferred Action for Childhood Arrivals ("DACA") recipients; persons admitted pursuant to the Compact of Free Association Act; persons with T-1, V, U1, U2, U3, U4, or U5 status; VAWA self-petitioners, including persons last admitted under INA §§ 101(a)(15)(A),

E(iii), (G), or (H); and persons admitted under certain Temporary Worker Classifications. Valid

work permits are no longer sufficient as proof of "authorized residency."

62.     The SFO Memo defines "authorized residency" to include only those categories

listed in the JFK Memo, with the exception that it does not specify that VAWA self-petitioners

include persons last admitted under INA §§ 101(a)(15)(A), E(iii), (G), or (H). As of November

19, 2025, SFO workers must prove that they fall into one of these categories.

63.     Further, on or about January 30, 2025, employers at Orlando Airport received

guidance from CBP that, pursuant to a "CBP SEAL NEW POLICY," valid work authorization is

no longer proof of "authorized residency."

64.     On information and belief, employers at Logan Airport, Houston Airport, and

other airports in the United States received or imminently will receive similar written or oral

guidance from CBP on the changed interpretation of "authorized residency."

65.     Many of the affected airport workers, including SEIU members, have possessed

and renewed their Customs seals without incident for years, and in some cases decades.

66.     CBP has targeted SEIU members including Individual Plaintiffs who pose no risk

or threat to public health, national security, or airport security, as demonstrated by their

uncontroverted years of good service.

67.     Defendants did not provide Individual Plaintiffs an opportunity to contest the loss

of their Customs seal before Defendants denied them access to their workplace and their jobs.

68.     The agency's mass cancellation of immigrant workers' Customs seals has not

only unjustly deprived SEIU members of their livelihood without cause or reason but has also

sowed confusion and chaos through its haphazard administration, jeopardizing the smooth, safe

functioning of our transportation system.

*Raquel Molina*

69.    Plaintiff Raquel Molina is a 65-year-old Boston resident, TPS recipient, asylum seeker, mother of one, and grandmother of five. She is a member of SEIU Local 32BJ, a local affiliate of SEIU. Through TPS, she received work authorization.

70.    Ms. Molina worked as a cabin cleaner at Logan Airport continuously for 27 years.

71.    In June 2025, Defendants abruptly and immediately revoked Ms. Molina's Customs seal, making it impossible for her to continue her work.

72.    On or around June 30, 2025, Ms. Molina received a letter from the Logan Port Director stating the grounds for revocation, a day after being notified by her employer that her seal had been revoked.

73.    The letter stated that Ms. Molina lacks authorized residency. The letter also stated that because she allegedly lacks authorized residency, she therefore "fails to meet CBP security standards" and "poses an unacceptable risk to public health, interest or safety, national security, aviation safety, the revenue, or the security of the area."

74.    Ms. Molina timely appealed the revocation, but CBP denied her appeal in August 2025.

75.    Since the revocation of her seal, Ms. Molina has been unable to find alternative work that accommodates her arthritis as her career as a cabin cleaner did. The loss of income has made it difficult for her to afford rent and food for her daughter and grandchildren, all of whom live with her.

76.    On or around 2004, Ms. Molina received TPS through designation of persons from El Salvador.

15

77.     Given her valid work permit and TPS status, Ms. Molina had authorized residency when her seal was revoked. CBP wrongly accused Ms. Molina of lacking authorized residency and erroneously deprived her of her seal.

### Ana Lemus

78.     Plaintiff Ana Lemus is a 58-year-old Boston-area resident who has had TPS and work authorization since 1999. She is currently in the process of adjusting her immigration status to become a lawful permanent resident through her U.S.-citizen children. She is a member of SEIU Local 32BJ, a local affiliate of SEIU. Her current work permit, which she received in April 2025 pursuant to her pending application for adjustment of status, is valid until April 2030.

79.     Ms. Lemus began working at Logan Airport in 2019 and worked as a cabin cleaner for more than six years.

80.     Sometime in summer 2025, CBP abruptly and immediately revoked Ms. Lemus's Customs seal, making it impossible for her to continue her work.

81.     Ms. Lemus never received a written notice of the seal revocation from the Logan Port Director or CBP.

82.     Defendants never informed Ms. Lemus of her right under the regulations to appeal the revocation, and as a result, she did not appeal the decision. In addition, Defendants never informed her of the specific grounds for revoking her seal.

83.     CBP's failure to give Ms. Lemus written notice expressly violated procedures required under its own regulations.

84.     On August 15, 2025, Ms. Lemus received a letter from her employer, G2 Secure Staff ("G2"), an airline service contractor, stating that she was being terminated because her

employment authorization had been revoked. On information and belief, G2 issued this letter to comply with CBP's new interpretation of the Customs seal regulations.

85.    G2 informed Ms. Lemus that as soon as her residency was authorized, G2 would give Ms. Lemus her job back and Ms. Lemus would retain her seniority.

86.    Since the revocation of her seal, Ms. Lemus has found only temporary, non-union work.

87.    Contrary to the G2 letter, Ms. Lemus's employment authorization has not been revoked.

88.    Ms. Lemus is authorized to work as an applicant for adjustment of status.

89.    She also has received TPS through designation of persons from Honduras. DHS terminated TPS designation and related benefits for persons from Honduras on September 8, 2025. On December 31, 2025, Judge Tina Thompson vacated the TPS termination. *National TPS Alliance v. Noem*, No. 25-cv-05687 TLT (N.D. Cal. Dec. 31, 2025). The Ninth Circuit stayed the district court's vacatur order pending appeal, *National TPS Alliance v. Noem*, No. 26-199 (9th Cir. Feb. 9, 2026), and a motion for reconsideration en banc is pending. *Id*. at ECF No. 14 (filed Feb. 23, 2026).

90.    Given her valid work permit, TPS, and pending application for adjustment of status, Ms. Lemus has authorized residency. CBP therefore wrongly accused Ms. Lemus of lacking authorized residency and erroneously deprived her of her seal.

### *Saint Paul Paul*

91.    Plaintiff Saint Paul Paul is a 58-year-old Boston resident, TPS holder, asylum seeker, and father of five children. He is a member of SEIU Local 32BJ, a local affiliate of SEIU.

Through his asylum application, Mr. Paul has received work authorization. His current work permit is valid until 2029.

92.     Mr. Paul worked as a cabin cleaner at Logan Airport for nearly three years. He was employed by G2, and then by airline service contractor HHS, to clean Delta Airlines airplanes.

93.     On or around June 29, 2025, CBP abruptly and immediately revoked Mr. Paul's Customs seal, making it impossible for him to continue his work.

94.     Mr. Paul discovered that his seal had been revoked when he and many others were suddenly blocked by security from accessing the terminal where he worked.

95.     Mr. Paul received a letter dated June 30, 2025 from the Logan Port Director stating the grounds for revocation, two days after being blocked from entering his workplace.

96.     The letter stated that Mr. Paul lacks authorized residency. The letter also stated that because he allegedly lacks authorized residency, he therefore "poses an unacceptable risk to public health, interest or safety, national security, aviation safety, the revenue, or the security of the area."

97.     Since the revocation of his seal, it has been difficult for Mr. Paul to find work. For several months, Mr. Paul found only temporary, non-union work at restaurants. These jobs were more physically demanding and lower paying than his work as a cabin cleaner and did not cover his family's expenses. Around September 2025, Mr. Paul began working at Chipotle.

98.     In 2020, Mr. Paul applied for asylum. His application is pending.

99.     Since 2022, Mr. Paul has received TPS through designation of persons from Haiti. While DHS published a notice on November 28, 2025 purporting to terminate TPS designation and related benefits for persons from Haiti as of February 3, 2026, individuals with Haitian TPS,

including Mr. Paul, maintain their TPS designation and work authorization per court order. *Miot v. Trump*, No. 25-cv-02471 ACR (D.D.C. Feb. 2, 2026), *stay pending appeal denied*, No. 26-5050 (D.C. Cir. Mar. 6, 2026).

100.    As an asylum seeker and TPS holder with a valid work permit, Mr. Paul has authorized residency. CBP therefore wrongly accused Mr. Paul of lacking authorized residency and erroneously deprived him of his seal.

### *Daysi Rocha-Cruz*

101.    Plaintiff Daysi Rocha-Cruz is a 27-year-old asylum seeker and Boston resident. She is a member of SEIU 32BJ, a local affiliate of SEIU.

102.    As a child, Ms. Rocha-Cruz loved watching planes and dreamed of one day becoming a flight attendant.

103.    Ms. Rocha-Cruz was employed as a cabin cleaner at Logan Airport from approximately September 2024 until CBP's revocation of her Customs seal in April 2025.

104.    Ms. Rocha-Cruz viewed working on planes as a cabin cleaner as a step toward her dream of becoming a flight attendant. She felt grateful that being in the United States gave her the opportunity to work towards that dream.

105.    Sometime in April 2025, Ms. Rocha-Cruz's supervisor called her to tell her that she could no longer work because her Customs seal had been revoked.

106.    Subsequently, on April 30, 2025, CBP sent Ms. Rocha-Cruz a letter stating that her Customs seal had been revoked because she had committed a "violation of U.S. immigration law" and her actions allegedly demonstrated that she posed "an unacceptable risk to public health, interest or safety, national security, aviation safety, the revenue, or the security of the area."

107.    These allegations caused Ms. Rocha-Cruz significant confusion and stress.

108.    Ms. Rocha-Cruz presented at a port of entry on the U.S.-Mexico border in July 2022. She was issued a Notice to Appear on July 31, 2022, and instructed to wait in Mexico for several months as part of the "Remain in Mexico" program. On October 28, 2022, Ms. Rocha-Cruz was paroled into the country on the basis of a reasonable fear of past or future persecution. The Notice to Appear was amended to reflect her parole.

109.    On August 31, 2023, Ms. Rocha-Cruz applied for asylum.

110.    As an asylum seeker paroled into the country, Ms. Rocha-Cruz has not violated U.S. immigration law.

111.    After losing her job as a cabin cleaner, Ms. Rocha-Cruz was unemployed for nearly three months.

112.    Ms. Rocha-Cruz then found temporary work cleaning a museum but wished to return to work at the airport.

113.    Ms. Rocha-Cruz finally found employment at Logan Airport in November 2025. She now works for The Waldwin Group in food services at the airport.

114.    Ms. Rocha-Cruz's new job is a non-union job and pays less than her work as a cabin cleaner.

115.    Ms. Rocha-Cruz's employment authorization is valid from June 22, 2024 to 2029.

116.    Ms. Rocha-Cruz's immigration status did not change between 2024, when she first received a Customs seal, and April 2025, when Defendants revoked her Customs seal.

117.    CBP wrongfully accused Ms. Rocha-Cruz of violating U.S. immigration law and erroneously deprived her of her Customs seal.

### *SEIU's Efforts to Assist Affected Workers, Including Plaintiffs, and Injury*

118.    SEIU is the largest union of service workers in the country. It has represented workers for over 100 years.

119.    SEIU was founded as the Building Service Employees Union in 1921 by immigrant janitors from Eastern Europe, Africa, Turkey, Spain, and Ireland. It was one of the few racially integrated unions of its time with Black, immigrant, and women leaders.

120.    Today, SEIU represents approximately two million workers, over 25% of whom identify as immigrants. SEIU members include foreign-born U.S. citizens, lawful permanent residents, and immigrants authorized to work in the United States.

121.    SEIU's work is guided by its vision for a just society where all workers are valued and all people respected—no matter where they are from.

122.    To achieve this vision, the union's work is centered on forging a multi-racial, multi-generational, multi-lingual labor movement that builds power for both immigrant and non-immigrant workers.

123.    Today, SEIU represents around 40,000 airport workers nationally.

124.    SEIU members, including but not limited to Individual Plaintiffs, have suffered the concrete and particularized harm of losing their Customs seals due to Defendants' actions and, as a result, losing their jobs.

125.    SEIU's mission is to benefit its members and improve their conditions by every means, including by ensuring that its members remain employed in union jobs, protecting members' rights on the job, and promoting worker and immigrant rights generally.

126.    Ensuring that immigrant worker members of SEIU can maintain their employment in positions represented by SEIU's local affiliates is germane to SEIU's organizational purpose.

127.    The relief requested in this complaint does not require the participation of individual workers or individualized proof.

128.    SEIU therefore brings this action on behalf of its members.

129.    Defendants' irrational and baseless attacks on immigrant jobs have stripped SEIU members including Individual Plaintiffs of their livelihoods and disrupted international airport operations on which millions of domestic and international travelers each year rely.

130.    Plaintiffs' claims are timely under 28 U.S.C. § 2401(a) because an APA claim does not accrue until the plaintiff is injured by final agency action. *Corner Post, Inc. v. Board of Governors*, 603 U.S. 799 (2023).

131.    Individual Plaintiffs and SEIU, on behalf of its members, have exhausted their administrative remedies and were injured fewer than six years before filing this complaint.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

### VIOLATION OF THE APA—ARBITRARY AND CAPRICIOUS AGENCY ACTION

#### (All Plaintiffs Against All Defendants)

#### (Interpretation of "Authorized Residency")

132.    Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this complaint as if fully set forth herein.

133.    The term "authorized residency," as used in 19 C.F.R. § 122.182(a), is not defined in CBP regulations or the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq*.

134.    On information and belief, prior to at least January 2025, CBP interpreted proof of "authorized residency" to include proof of authorization to work.

135.    On information and belief, since at least February 2025, CBP has adopted an agency-wide policy interpreting "authorized residency" to refer only to certain U.S. immigration statuses and distinguished it from authorization to work.

136.    Defendants' agency-wide interpretation of the phrase "authorized residency" in 19 C.F.R. § 122.182(a) constitutes final agency action.

137.    CBP has communicated its interpretation of "authorized residency" in memos or other writings, such as the JFK Memo and the SFO Memo.

138.    According to the JFK Memo, persons with "authorized residency" are citizens; lawful permanent residents; persons admitted as refugees; persons granted asylum; DACA recipients; persons admitted pursuant to the Compact of Free Association Act; persons with T-1, V, U1, U2, U3, U4, U5 status; VAWA self-petitioners, including persons last admitted under INA §§ 101(a)(15)(A), (E)(iii), (G), or (H); and persons admitted under certain Temporary Worker Classifications.

139.    The SFO Memo likewise limits "authorized residency" only to the categories listed in the JFK Memo, but it does not specify that VAWA self-petitioners include persons last admitted under INA §§ 101(a)(15)(A), (E)(iii), (G), or (H).

140.    The JFK Memo contains detailed instructions on the types of documentation suitable to establish forms of "authorized residency" under CBP's new interpretation; the SFO Memo contains only cursory guidance, seemingly leaving the question of adequate documentation to local CBP offices to determine.

141.    CBP's differing implementations of its new interpretation of "authorized residency," as exemplified in these two memos, are evidence of the agency's capricious process in redefining the phrase.

142.    Individual Plaintiffs' immigration statuses did not change in the months leading up to CBP's revocation of their seals. Yet they nonetheless received letters informing them that their seals were revoked due to lack of authorized residency, when they were previously determined by CBP to have authorized residency for years, or even decades. This represents a departure from past agency interpretation of the regulations.

143.    CBP has failed to explain the change in policy or to explain why SEIU members' including Individual Plaintiffs' valid work authorization previously constituted authorized residency but no longer does. Nor has CBP taken account of the reliance interests of the Individual Plaintiffs and other SEIU members. The letters sent to SEIU members including Individual Plaintiffs did not provide any explanation justifying the agency's new interpretation of "authorized residency."

144.    CBP has also failed to explain why immigrant airport workers with valid work authorization but who do not satisfy its new interpretation of "authorized residency" constitute an unacceptable risk to public health, interest or safety, national security, aviation safety, airport revenue, or Customs security.

145.    It is arbitrary and capricious to classify asylum seekers and TPS holders as lacking authorized residency and therefore posing a security risk when they have the permission of the federal government to be present in the United States; maintain work authorization; and have passed the same rigorous security screening as other airport workers with Customs seals, including a background check and biometrics collection.

24

146.     Defendants' change in interpretation of "authorized residency" is arbitrary and capricious in violation of the APA and should be set aside pursuant to 5 U.S.C. § 706(2)(A).

**(Interpretation of "Violation of a U.S. Immigration Law")**

147.     Since February 2025, SEIU members with pending asylum claims have received letters informing them that Defendants were immediately revoking their Customs seal due to a supposed violation of U.S. immigration law.

148.     Every worker with valid work authorization who passed a background check was previously eligible for a Customs seal.

149.     On information and belief, CBP changed its interpretation of "violation of a U.S. immigration law" in 19 C.F.R. § 122.183(a)(4)(xxxiv) to apply to individuals with valid work authorization who have pending asylum claims and has memorialized this changed interpretation in writing.

150.     Defendants' agency-wide interpretation of the phrase "violation of a U.S. immigration law" in 19 C.F.R. § 122.183(a)(4)(xxxiv) constitutes final agency action.

151.     In addition, CBP previously did not enforce § 122.183(a)(4)(xxxiv) and began to do so in the spring of 2025, leading to the revocation of the Individual Plaintiffs' and others' seals.

152.     CBP has not provided any acknowledgment of or explanation for its policy change, whether a change in interpretation or a change in enforcement.

153.     CBP has also failed to explain why "violation of a U.S. immigration law" constitutes an unacceptable risk to public health, interest or safety, national security, aviation safety, airport revenue, or Customs security. Nor has CBP taken account of the reliance interests of the Individual Plaintiffs and other SEIU members.

154.    Defendants' change in interpretation of "violation of a U.S. immigration law" therefore is arbitrary and capricious in violation of the APA and should be set aside pursuant to 5 U.S.C. § 706(2)(A).

**(Inclusion of "Violation of a U.S. Immigration Law" in the Regulation)**

155.    In the 2002 IFR, CBP significantly increased the potential grounds for denial and revocation of seals, adding that any person who "has been arrested for, or charged with" "[a]ny violation of a U.S. immigration law" would lose their seal. 19 C.F.R. §§ 122.183(a)(4)(xxxiv), 122.187(a)(2)(iii).

156.    Defendants' promulgation of regulations under the 2002 IFR constitutes final agency action.

157.    The 2002 IFR copied many of the grounds for Customs seal denial and revocation from a 2001 Final Rule promulgated by the Federal Aviation Administration ("FAA"). *See* Criminal History Records Check, 66 Fed. Reg. 63474 (Dec. 6, 2001). The FAA Final Rule provided that an airport worker's access to the Security Identification Display Area ("SIDA")— where unescorted workers must display identification issued by an airport or aircraft operator— must be suspended if they are found to have been convicted of a "disqualifying criminal offense." *Id*.

158.    The FAA Final Rule grounds for suspension of access do *not* include "violation of a U.S. immigration law" or any immigration-related ground. Moreover, immigration status violations are civil, not criminal.

159.    The 2002 IFR stated that CBP "believes that it is useful, wherever practicable, to use similar standards as those of the FAA since the need to address security concerns at airports is universal and the same people will be given access to areas at airports that are concentric or

26

overlapping under the separate approval regimes of the two agencies." Access to Customs

Security Areas at Airports, 67 Fed. Reg. 48977, 48981 (Jul. 29, 2002).

160.    The 2002 IFR justified its expanded list of grounds for denial and revocation,

including "violation of a U.S. immigration law," by saying that the "mission of Customs is not in

all cases the same as that of the FAA" and that the additional CBP grounds "relate directly to a

Customs statutory enforcement mandate." *Id.*

161.    There is no logical basis for denying or revoking Customs area access on

immigration-related grounds where FAA regulations authorize access to areas that are

"concentric or overlapping" without regard to immigration. *Id.* An employee whose Customs

seal is denied or revoked by CBP for "violation of a U.S. immigration law" may, with no change

in immigration history or status, be eligible for a SIDA badge that will allow them, under FAA

regulations, to access many or all of the same secure areas as a Customs seal.

162.    CBP has not explained how its mission differs from that of the FAA, nor how that

difference connects rationally to denial or revocation of access to secure airport areas based on

"violation of a U.S. immigration law."

163.    19 C.F.R. § 122.183(a)(4)(xxxiv) violates the APA and should be set aside

pursuant to 5 U.S.C. § 706(2)(a) because it is arbitrary and capricious.

## SECOND CLAIM FOR RELIEF

## VIOLATION OF THE APA—ARBITRARY AND CAPRICIOUS AGENCY ACTION

### (All Plaintiffs Against All Defendants)

### (Unlawful Revocation of Individual Seals)

164.    Plaintiffs repeat and re-allege the allegations contained in the preceding

paragraphs of this complaint as if fully set forth herein.

165.    Each respective revocation letter sent to Individual Plaintiffs and other SEIU members stated that Defendants had determined that the worker poses "an unacceptable risk to public health, interest or safety, national security, aviation safety, the revenue, or the security of the area," and were thus revoking the worker's Customs seal.

166.    CBP had previously granted Customs seals to each Individual Plaintiff and other SEIU members, and Individual Plaintiffs and other SEIU members had used those seals to work in Logan Airport and at other airports around the country.

167.    Nothing changed about the immigration status or work authorization of any Individual Plaintiff in the months leading up to CBP's revocation of their Customs seals.

168.    The revocation letters, and the letters denying Individual Plaintiffs' appeals, did not provide any explanation justifying the agency's determination that they now pose an "unacceptable risk" to national or airport security after CBP had previously determined that they did not pose such a risk and awarded them Customs seals.

169.    CBP also revoked the Customs seals of other SEIU members on the basis that they pose "an unacceptable risk to public health, interest or safety, national security, aviation safety, the revenue, or the security of the area."

170.    Defendants' revocation and/or denial of Individual Plaintiffs' seals, and the seals of other SEIU members, on the basis that they pose "an unacceptable risk to public health, interest or safety, national security, aviation safety, the revenue, or the security of the area" violates the APA and should be set aside pursuant to 5 U.S.C. § 706(2)(A) because it is arbitrary and capricious.

## THIRD CLAIM FOR RELIEF

## VIOLATION OF THE APA—WITHOUT OBSERVANCE OF PROCEDURE

## REQUIRED BY LAW

### (Plaintiffs SEIU and Ana Lemus Against All Defendants)

### (Unlawful Revocation of Individual Seals)

171.    Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this complaint as if fully set forth herein.

172.    Federal agencies are required to follow their own rules and regulations. *United States* ex rel. *Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

173.    According to CBP regulations, the Port Director must give written notice of a seal revocation to the employee within 10 calendar days of revocation, which must state the specific grounds for revocation and notify the employee of their option to appeal. 19 C.F.R. § 122.187(b)(1).

174.    Plaintiff Ana Lemus never received a written notice of the revocation of her Customs seal from the Logan Port Director or CBP, in violation of notice requirements under *id.* § 122.187(b).

175.    Other SEIU members, including but not limited to members employed at JFK and Logan Airport, also never received written notice of revocations, in violation of notice requirements.

176.    Defendants' unlawful revocation without notice of Ms. Lemus's seal and other SEIU members' seals violated the APA and should be set aside pursuant to 5 U.S.C. § 706(2)(D) because they failed to comply with procedure required by law.

## FOURTH CLAIM FOR RELIEF

## VIOLATION OF THE APA—UNCONSTITUTIONAL AGENCY ACTION

### (All Plaintiffs Against All Defendants)

### (Unlawful Emergency Revocation)

177.    Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this complaint as if fully set forth herein.

178.    The APA provides that the reviewing court shall invalidate agency action found to be "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

179.    Given that 19 C.F.R. § 122.187(b)(1) violates the Fifth Amendment as applied to Individual Plaintiffs and other SEIU members, the regulation and all agency actions taken pursuant to the regulation should be set aside pursuant to 5 U.S.C. § 706(2)(B).

## FIFTH CLAIM FOR RELIEF

## VIOLATION OF THE FIFTH AMENDMENT – LACK OF PRE-DEPRIVATION HEARING

### (All Plaintiffs Against All Defendants)

### (Unlawful Emergency Revocation)

180.    Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this complaint as if fully set forth herein.

181.    The Fifth Amendment protects against "depriv[ations] of life, liberty, or property, without due process of law." U.S. Const. amend. V.

182.    SEIU members including Individual Plaintiffs have a vested property interest, protected by the Fifth Amendment, in continued possession of their Customs seals. The seals are

a form of government-created license and are Individual Plaintiffs' means of pursuing a livelihood.

183.    Since CBP revoked their seals, SEIU members including Individual Plaintiffs have been unable to pursue their livelihoods as cabin cleaners. Plaintiff Raquel Molina, who worked as a cabin cleaner for twenty-seven years, has been unable to find alternative work since CBP revoked her Customs seal. Ana Lemus has found only temporary, non-union work. Plaintiffs Saint Paul Paul and Daysi Rocha-Cruz have found only non-union positions for lower pay.

184.    Customs seal regulations provide for a post-revocation hearing upon the Port Director's determination that there exists a "genuine issue of fact that is material to the revocation or suspension," but do not provide for a pre-deprivation opportunity to be heard in SEIU members' cases, including those of Individual Plaintiffs, whose seals were immediately revoked. 19 C.F.R. § 122.187(c)(2).

185.    In the absence of pre-revocation procedural safeguards, a post-revocation hearing is constitutionally inadequate.

186.    SEIU members including Individual Plaintiffs have a strong interest in continued possession of their seals, without which they cannot pursue their livelihoods and support themselves and their families.

187.    Without pre-revocation procedural safeguards, the risk of erroneous deprivation is high. At least one SEIU member was erroneously deprived of their Customs seal when CBP sent them a revocation letter based on mistaken information. CBP did not acknowledge the error until after the member had already lost their job based on CBP's erroneous revocation letter.

188.    SEIU members including Ms. Lemus never received notice of any kind from CBP regarding the revocation of their Customs seals.

189.    The government lacks any valid interest in emergency revocation of Individual Plaintiffs' Customs seals. The government has no reasonable cause to believe that Individual Plaintiffs, by virtue of their immigration statuses alone, pose a risk to public health, safety, or national security. Collectively, Individual Plaintiffs have worked as cabin cleaners for approximately 36 years in total, during which time they have *protected* public health and safety and our national security interests—including during the Covid-19 pandemic—by ensuring that airplane facilities are in safe and clean condition.

190.    19 C.F.R. § 122.187(b)(1) is unconstitutional and violates the Fifth Amendment as applied to SEIU members including Individual Plaintiffs because it authorizes CBP to deprive Customs seal holders of a protected property interest—the possession of which is essential in the pursuit of a livelihood—without constitutionally adequate process.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff SEIU, on behalf of its members, and Individual Plaintiffs respectfully request that this Court enter judgment against Defendants and award the following relief:

A. Declare that 19 CFR §§ 122.183(a) and 122.183(a)(4)(xxxiv), the recent implementation of the Customs seal regulations, and the individual Customs seal revocations and denials are unlawful and/or unconstitutional because they violate the APA and the Fifth Amendment.

B. Enter permanent relief, including but not limited to:

1. Ordering Defendants to vacate and set aside the revocations and denials of Customs seals from the Individual Plaintiffs and similarly situated SEIU members;

2. Ordering Defendants to set aside 19 C.F.R. §§ 122.183(a) and 122.183(a)(4)(xxxiv);

3. Ordering Defendants to vacate and set aside any final agency action implementing their restrictive 2025 interpretation of "authorized residency" and "violation of a U.S. immigration law" for the purposes of revoking Customs seals from immigrant workers; and

4. Ordering Defendants to provide adequate notice and an opportunity to be heard in a pre-deprivation hearing before revoking a Customs seal.

C. Order Defendants to compensate Plaintiffs for their attorneys' fees and costs, under the Equal Access to Justice Act.

D. Grant such other and further relief that this Court deems just and proper.


Dated: March 13, 2026

/s/ Michael J. Wishnie
Spencer Goldberg, Law Student Intern*
Marisa Houlahan, Law Student Intern*
Amala Karri, Law Student Intern*
Elias Mastakouris, Law Student Intern*
Amanda Powers, Law Student Intern*
Helen Zhao, Law Student Intern*
Michael J. Wishnie (BBO #568654)
Muneer I. Ahmad**
Worker & Immigrant Rights Advocacy Clinic           *Motion for law student admission
Jerome N. Frank Legal Services Organization          forthcoming
P.O. Box 209090                                       **Motion for pro hac vice admission
New Haven, CT 06520                                   forthcoming